**CADES SCHUTTE**
A Limited Liability Law Partnership

TREVER K. ASAM 8133
LINDSAY N. MCANEELEY 8810
1000 Bishop Street, Suite 1200
Honolulu, HI 96813
Telephone: (808) 521-9200
Email: tasam@cades.com
lmcaneeley@cades.com

**WILEY REIN**
A Limited Liability Law Partnership

CALEB P. BURNS*
JEREMY J. BROGGI*
2050 M Street NW
Washington, DC 20036
Telephone: (202) 719-7000
Email: cburns@wiley.law
jbroggi@wiley.law

**U.S. CHAMBER LITIGATION CENTER**
JONATHAN D. URICK*
KEVIN R. PALMER*
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337
Email: JUrick@USChamber.com
KPalmer@USChamber.com

Attorneys for Plaintiff CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA
* *Pro Hac Vice* Motions Forthcoming

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as Attorney General of Hawaiʻi, and NADINE ANDO, in her official capacity as Director of Hawaiʻi Department of Commerce and Consumer Affairs,<br><br>Defendants. | CIVIL NO. ______________________<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**EXHIBITS A–I** |

**INTRODUCTION**

Plaintiff Chamber of Commerce of the United States of America ("the Chamber"), by and through undersigned counsel, brings this suit against Defendants Anne E. Lopez and Nadine Ando in their official capacities. In support thereof, the Chamber states as follows:

1. Hawai'i has enacted a law known as Act 11, a categorical ban on political speech by corporations and other organizations. *See generally* Relating to the Powers of Artificial Persons, S.B. No. 2471, 33rd Leg., Reg Sess., 2026 Haw. Sess. Laws Act 11, *available at* https://tinyurl.com/45xv8cfb ("Act 11"). Hawai'i rests its ban on the false premise "that the State possesses plenary authority to determine the powers and capacities of the artificial persons it creates." *Id.* § 1. Yet Act 11 also contradicts that premise by restricting the political speech of "foreign corporation[s]" that the State does not create—revealing that the Act is, at bottom, a speech prohibition. *See, e.g.*, *id.* § 10.

2. Act 11 cannot be reconciled with the First Amendment or binding Supreme Court precedent. "The First Amendment's protection of free speech has its 'fullest and most urgent application precisely to the conduct of campaigns for political office.'" *NRSC v. FEC*, 146 S. Ct. 2404, 2415 (2026) (quoting *FEC v. Cruz*, 596 U.S. 289, 302 (2022)). Speech about elections, candidates, political parties, and ballot issues is thus "core political speech" for which First Amendment protection

"is 'at its zenith.'" *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999). Yet Act 11 forbids this very speech.

3. In *Citizens United v. FEC*, 558 U.S. 310 (2010), the Supreme Court squarely held "that First Amendment protection extends to corporations." *Id.* at 342. The Court expressly "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Id.* at 343.

4. Nor was *Citizens United* an outlier. The Supreme Court there cited over 20 of its prior decisions extending First Amendment protection to corporations, demonstrating that the Court has long rejected the "extreme position"—advanced by Hawaiʻi here—"that corporations, as creatures of the State, have only those rights granted them by the State." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14 (1978). The Court has likewise summarily rejected efforts by States to evade these crystal-clear holdings and restrict speech by artificial entities. *See American Tradition Partnership, Inc. v. Bullock*, 567 U.S. 516 (2012) (per curiam) (holding that "[t]here can be no serious doubt that" "the holding of *Citizens United* applies to" the States).

5. Act 11 goes further still. Although Hawaiʻi claims authority over artificial persons because the State "creates" them, the Act also strips entities created by *other* States and the District of Columbia of the power to speak. Hawaiʻi cannot

define away the First Amendment rights of non-Hawai‘i corporations, much less silence them by threatening to revoke their authority to transact business within the State.

6. The Chamber therefore brings this action to prevent Hawai‘i public officials from enforcing Act 11.

**PARTIES**

7. Plaintiff the Chamber of Commerce of the United States of America is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly litigates on behalf of itself and its members on issues of concern to the nation's business community. The Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, D.C. and incorporated under the laws of the District of Columbia.

8. Defendant Anne E. Lopez is the Attorney General of Hawai‘i, and the claims in this Complaint are asserted against Defendant Lopez in her official capacity. The Attorney General of Hawai‘i has the authority to impose penalties and bring actions under Act 11. *See* Act 11 §§ 23–24.

9. Defendant Nadine Ando is the Director of the Hawai‘i Department of Commerce and Consumer Affairs, and the claims in this Complaint are asserted against Defendant Ando in her official capacity. The Director of the Hawai‘i Department of Commerce and Consumer Affairs has the authority to impose penalties and bring actions under Act 11. *See* Act 11 §§ 23–24.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

11. The Chamber asserts claims under 42 U.S.C. § 1983 and seeks all relief available thereunder, including attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law.

12. The Chamber invokes this Court's equitable authority to enjoin unconstitutional conduct by state officers. *See Ex Parte Young*, 209 U.S. 123 (1908); *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026).

13. The Chamber seeks declaratory and equitable relief pursuant to the Court's inherent authority and the Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201, 2202.

14. Venue is proper in this District because it is the judicial district in which all Defendants reside. 28 U.S.C. § 1391(b)(1).

## STANDING

15. Act 11 directly burdens and restricts the Chamber's First Amendment rights. The Chamber regularly engages in political speech, including election-related speech and associational activities of the type that Act 11 would deem impermissible "election activity."

16. As the nation's leading voice for business, the Chamber regularly participates in political speech, including election-related speech and associational activities. For example, the Chamber has repeatedly endorsed Representative Ed Case for Hawai'i's 1st Congressional District. *See* Ex. A, Press Release, U.S. Chamber Endorses Rep. Ed Case for Hawaii's 1st Congressional District (Oct. 18, 2024), https://tinyurl.com/2aky4pzn; Press Release, U.S. Chamber Endorses Rep. Ed Case for Hawaii's 1st Congressional District (Oct. 28, 2022), https://tinyurl.com/278v5h27. Separately, although the Chamber does not engage in express candidate advocacy, it often supports or opposes particular candidates, short of express advocacy, by speaking favorably or unfavorably about them while expressing approval or disapproval of their specific policy positions. This includes the dissemination of electioneering communications that refer favorably or unfavorably to particular candidates in the course of discussing their various policy positions.

17. The Chamber recently conducted a six-figure advocacy campaign supporting the One Big Beautiful Bill Act. It involved 32 billboards across the country as well as paid digital advertising. The campaign referenced fourteen U.S. Representatives and two U.S. Senators. The campaign was designed to educate constituents on the benefits of making certain tax cuts permanent, thanking lawmakers who were supporting this pro-growth policy, and in some cases, drawing attention to those Members of Congress who were not supportive of the bill. *See* Ex. B, Press Release, U.S. Chamber Launches Paid Tax Campaign, U.S. Chamber of Commerce (May 30, 2025), https://tinyurl.com/ynf8arn3.

18. The Chamber regularly engages in candidate-related advocacy, including through so-called "electioneering communications" that refer to clearly identified candidates, and through contributions supporting organizations that advocate for candidates who align with the Chamber's values.

19. For example, the Chamber expended $75,000 for media advertisements thanking Representative Valadao (CA-22) for supporting small businesses. *See* Ex. C, U.S. Chamber of Commerce, FEC Form 9, No. 202211049546709595, 24 Hour Notice of Disbursements/Obligations for Electioneering Communications (Nov. 4, 2022), *available at* https://tinyurl.com/spv2wx74.

20. It also expended $460,000 for media advertisements thanking Representatives Valadao (CA-22) and Chabot (OH-01) for supporting small

businesses. *See* Ex. D, U.S. Chamber of Commerce, FEC Form 9, No. 202210289546667729, 24 Hour Notice of Disbursements/Obligations for Electioneering Communications (Oct. 28, 2022), *available at* https://tinyurl.com/5xtppup3. And it expended $200,000 for media advertisements thanking Representative Bacon (NE-02). *See* Ex. E, U.S. Chamber of Commerce, FEC Form 9, No. 202210219541487297, 24 Hour Notice of Disbursements/Obligations for Electioneering Communications (Oct. 21, 2022), *available at* https://tinyurl.com/54pxvmh4.

21. Similarly, during a recent mid-term election cycle, the Chamber contributed $1.5 million to the North Carolina Chamber of Commerce to fund advocacy in support of candidates for state office who align with the Chamber's values. *See* Ex. F, North Carolina Chamber, Political Committee Disclosure Report (2022 Third Quarter), *available at* https://tinyurl.com/54xuspee.

22. The Chamber has recently launched a multi-phase, multi-year advocacy initiative called the New Fight for Free Enterprise. *See* Ex. G, Press Release, The New Fight for Free Enterprise, U.S. Chamber of Commerce (June 3, 2026), https://tinyurl.com/2s46xrnf.

23. Through the New Fight for Free Enterprise, the Chamber is working to defend and renew America's economic foundation. For 250 years, free enterprise has been the foundation of American growth, innovation, and rising living standards.

Yet today, this system is being steadily undermined. An organized movement is working to erode public support for free enterprise and business and to give government more power to determine market outcomes.

24. The Chamber is responding in four key areas nationwide. First, the Chamber is competing directly in the public arena through a modern and data-driven communications effort to ensure that free enterprise is represented accurately in the national and local conversation.

25. Second, the Chamber is strengthening its network of state and local partners to ensure that free enterprise has well-coordinated defenders in every State where the future of the economy is being shaped.

26. Third, the Chamber is using its litigation capacity both offensively and defensively to help protect the ability of businesses to operate and compete freely.

27. Fourth, the Chamber is investing in a long-term effort to build a pipeline of pro-growth leaders—engaging with candidates early, strengthening relationships, and providing them with the knowledge and support they need to advance free enterprise.

28. On September 18, 2026, as part of the first phase of the New Fight for Free Enterprise, the Chamber launched a national bus tour in support of free enterprise, known as the Opportunity Tour. *See* Ex. H, Press Release, On the Road for Opportunity: U.S. Chamber Launches National Free Enterprise Bus Tour (Sep.

18, 2026), https://tinyurl.com/2h78mthb; Ex. I, Press Release, Why We're Taking Free Enterprise on the Road, U.S. Chamber (Sep. 18, 2026), https://tinyurl.com/mptxseh7. Departing from its D.C. headquarters, the Free Enterprise Express bus will spend six weeks traveling through key States, cities, and communities to drive the debate on economic policy. The Opportunity Tour will promote the message of free enterprise and underscore that free enterprise is a prevalent election-related issue in 2026 and beyond.

29. The Opportunity Tour will put a national spotlight on the local leaders, businesses, and workers fueling growth and opportunity across America. Along the way, the Chamber will also showcase its support for pro-growth officeholders in these communities who are running for re-election and have defended free enterprise. The Chamber will hold dozens of public-facing events, including at local chambers, and it will amplify the tour through a nationwide communications effort.

30. The Chamber also intends to launch a complementary digital communications voter-education effort in parallel with the Opportunity Tour across the country, including in places such as Hawai‘i where the Free Enterprise Express will not visit, to ensure wider distribution of the Chamber's message. Like the New Fight for Free Enterprise, this will be a multi-phase, multi-year communications effort, lasting longer than the Opportunity Tour, designed to educate voters about the virtues and benefits of free enterprise and the dangers of socialism. Over time,

this voter-education effort will expand and become more targeted, moving from the initial phase discussing general free-enterprise principles to more specific discussion of particular candidates' alignment with or opposition to those principles. The effort will begin during the current 2026 election cycle with communications advocating generally in favor of free enterprise and against socialism. For this initial phase of the Chamber's voter-education strategy, the Chamber intends to target jurisdictions, including Hawaiʻi, where the Democratic Socialists of America have endorsed candidates for public office during the current election cycle or previously.

31. The Chamber intends to continue its New Fight for Free Enterprise initiative beyond 2026. In parallel with that ongoing nationwide initiative, the Chamber presently intends to engage in and expand its complementary voter-education communications across the country during the 2027–2028 election cycle and beyond. This next phase of the Chamber's broader voter-education strategy will continue the Chamber's advocacy in favor of free enterprise and against socialism.

32. During the 2027–2028 election cycle, this next phase of the Chamber's planned voter-education strategy will include communications in Hawaiʻi discussing free-enterprise principles relevant to the Hawaiʻi business community. The Chamber believes that Hawaiʻi is an important forum for its message because debates concerning free enterprise, government control of economic outcomes, and

the proper role of business in public life have become increasingly prominent in the State.

33. In the course of discussing free-enterprise principles, the Chamber's planned Hawai'i communications will identify specific candidates for Hawai'i state office by name and will support or oppose those candidates, directly or indirectly, by discussing with approval or disapproval their alignment with those principles and their positions on various other issues affecting the business community. In particular, the Chamber presently intends to disseminate communications in Hawai'i during the 2027–2028 election cycle referring favorably or unfavorably to specific candidates for Hawai'i state office by expressing approval or disapproval of their positions on free enterprise and alternative economic and political systems such as socialism.

34. The Chamber likewise specifically intends to inform Hawai'i constituents during the 2027–2028 election cycle about state candidates' positions on Act 11, among other measures affecting free enterprise and the business community, expressing approval or disapproval of those positions. Act 11 itself exemplifies the growing challenge to free-enterprise principles in Hawai'i. The legislation was sponsored and supported by elected officials who continue to shape Hawai'i's economic and regulatory policies and whose positions on free-enterprise issues remain matters of public concern. The Chamber's planned Hawai'i

communications will discuss positions taken by specific candidates for Hawai‘i state office, including those who supported, opposed, or continue to defend Act 11, expressing approval or disapproval of those positions.

35. In preparing its planned Hawai‘i communications about candidates for Hawai‘i state office, the Chamber would evaluate candidates’ positions on matters affecting free enterprise, develop messaging concerning those positions, and determine appropriate channels for communicating with Hawai‘i constituents. The Chamber will undertake those communications as part of its planned multistate advocacy efforts so long as Hawai‘i does not prohibit it from doing so.

36. However, the Chamber is a non-Hawai‘i nonprofit corporation. Its planned expenditures and communications supporting or opposing candidates for Hawai‘i state office fall within Act 11’s prohibition on “election activity.” *See* Act 11 §§ 8 (HRS[1] § 414D-14), 10 (HRS § 414D-52(b), (e)). If the Chamber engaged in its planned activities, it would “be conclusively deemed to be transacting business in the State” and exposed to the Act’s enforcement regime, including the “penalties and sanctions” described below. Act 11 § 10 (HRS § 414D-52(e)).

37. The penalties and sanctions specified in Act 11 include (1) temporary suspension of operations, (2) a ban on government contracts, (3) revocation of tax-

[1] All references to Haw. Rev. Stat. in this Complaint are abbreviated to HRS.

exempt status, where applicable, (4) designation of the organization as non-compliant and the imposition of additional reporting obligations, (5) revocation of the organization's charter or authority to operate in the State, and (6) involuntary dissolution. Act 11 §§ 23–24.

38. Hawaiʻi corporate law imposes additional consequences on non-Hawaiʻi entities that are deemed to be transacting business in the State without authorization. These include liability to the State "in an amount equal to all fees that would have been imposed by this chapter upon the corporation" had the entity maintained any necessary authorizations, "plus all penalties imposed by this chapter for failure to pay the fees." HRS § 414D-272(d) (non-profit corporations); *see* § 414-432(d) (business corporations). Furthermore, an entity that lacks authorization "shall not maintain a proceeding in any court in this State." § 414D-272(a) (non-profit corporations); *see* § 414-432(a) (business corporations). By authorizing state officials to revoke a non-Hawaiʻi entity's authority to transact business if it participates in election activity or ballot-issue activity, Act 11 threatens significant collateral legal consequences including loss of access to Hawaiʻi courts.

39. Although Defendant Lopez previously acknowledged that Act 11 is "likely" unconstitutional, *Relating to the Powers of Artificial Persons: Hearing on S.B. No. 2471, S.D. 2, H.D. 1 Before the H. Comm. on Judiciary and Haw. Affs.*, 33rd Leg., Reg. Sess. 5 (Haw. 2026) (testimony of Haw. Att'y Gen.) ("House

Hearing”), *available at* https://tinyurl.com/553jwypt, her office has not disavowed enforcement and is now defending the statute in court, *see* Mike Leonard, *Hawaii Defends Anti-Citizens United Law Against Court Challenge*, Bloomberg Law (Aug. 24, 2026), https://tinyurl.com/4c5wnxkj. The Chamber thus reasonably fears that, if it engages in its planned communications supporting or opposing candidates for Hawai‘i state office, Defendants will initiate enforcement action and subject the Chamber to Act 11’s penalties.

40. The Chamber is unwilling to expose itself to Act 11’s threatened penalties by engaging in speech that the statute prohibits. Unless Act 11’s enforcement is enjoined, the Chamber will not engage in its planned expenditures and communications supporting or opposing candidates for Hawai‘i state office during the 2027–2028 election cycle. But for Act 11, the Chamber would proceed with planning, funding, and disseminating those communications.

41. The Chamber is planning its nationwide advocacy efforts for the 2027–2028 election cycle now. The Chamber does not decide overnight to disseminate communications regarding candidates and issues affecting its members. Such communications require advance planning, budgeting, message development, strategic decisionmaking, and final internal approvals. The Chamber accordingly must now undertake those preparation activities for the Hawai‘i communications that it intends to make during the 2027–2028 election cycle after Act 11 takes effect

on July 1, 2027. As a result, Act 11 is already impeding the Chamber's planning for communications supporting or opposing candidates for Hawai‘i state office during the 2027–2028 election cycle. Those harmful and disruptive chilling effects will grow as that election cycle approaches and the Chamber must make final decisions concerning those communications.

42. The harm the Chamber is already experiencing and will continue to experience from Act 11's chilling of the Chamber's speech is irreparable. *See Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (alteration rejected)). If the Chamber is unable or unwilling to communicate with Hawai‘i constituents during the 2027–2028 election cycle because of Act 11, a later merits victory cannot restore the lost opportunity to participate in those debates. Nor can a later court order undo the present burdens that Act 11 imposes on the Chamber's ongoing planning, budgeting, message development, and strategic decisions concerning those communications.

## BACKGROUND

### I. THE FIRST AMENDMENT PROTECTS SPEECH BY CORPORATIONS AND OTHER ASSOCIATIONS

43. The First Amendment, applicable to the States through the Fourteenth Amendment, provides: "Congress shall make no law… abridging the freedom of

speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I.

44. "The First Amendment embodies 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *NRSC v. FEC*, 146 S. Ct. 2404, 2415 (2026). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). "The First Amendment 'envisions the United States as a rich and complex place' where all enjoy the 'freedom to think as you will and to speak as you think.'" *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 584, 603 (2023)).

45. "The First Amendment's protection of free speech has its 'fullest and most urgent application precisely to the conduct of campaigns for political office.'" *NRSC*, 146 S. Ct. at 2415. Speech about elections, candidates, political parties, and ballot issues is thus "core political speech" for which First Amendment protection "is 'at its zenith.'" *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999). Moreover, "[b]ecause 'virtually every means of communicating ideas in today's mass society requires the expenditure of money,' a 'restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues

discussed, the depth of their exploration, and the size of the audience reached.'" *NRSC*, 146 S. Ct. at 2412.

46. The Supreme Court has long held that First Amendment protection extends to speech by corporations and other artificial entities. As early as 1898, Justice Harlan, writing for a unanimous Court, declared it "settled" law "[t]hat corporations are persons within the meaning of" the Fourteenth Amendment. *Smyth v. Ames*, 169 U.S. 466, 523 (1898). Accordingly, the Fourteenth Amendment forbids States from abridging the First Amendment rights of corporations. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 497 (1952); *cf. Pierce v. Soc'y of Sisters*, 268 U.S. 510, 531 (1925).

47. First Amendment protection for corporations recognizes that "[a] corporation is simply a form of organization used by human beings to achieve desired ends." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). "When rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people." *Id.* at 706–07; *see NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association"). "Corporations and other associations, like individuals, contribute to the discussion, debate, and dissemination of information

and ideas that the First Amendment seeks to foster." *Citizens United v. FEC*, 558 U.S. 310, 343 (2010) (quotations omitted).

48. In *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), the Supreme Court considered a Massachusetts law prohibiting companies from making "contributions or expenditures" to influence the vote on ballot initiatives unless the initiative "materially affect[ed]" their business or assets. *Id.* at 767–68. The Court held that the law violates the First Amendment. *Id.* at 795. The Court expressly rejected "the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation." *Id.* at 784. It also rejected the "extreme position" that "corporations, as creatures of the State, have only those rights granted them by the State." *Id.* at 778 n.14.

49. In *Citizens United v. FEC*, 558 U.S. 310 (2010), the Supreme Court reaffirmed "that First Amendment protections extend to corporations." *Id.* at 342 (citing over twenty cases). Although the corporate form undeniably provides benefits "such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets," the Court explained that "the State cannot exact as the price of those special advantages the forfeiture of First Amendment rights." *Id.* at 351. It thus held unconstitutional a federal law that "prohibit[ed] corporations and unions from using their general treasury funds to make independent

expenditures for speech defined as an 'electioneering communication' or for speech expressly advocating the election or defeat of a candidate." *Id.* at 318.

50. The Court has since confirmed that *Citizens United* applies to the States, striking down a "Montana state law" which "provid[ed] that a 'corporation may not make . . . an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party.'" *Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516, 516 (2012) (per curiam). The Court explained that there was "no serious doubt that" *Citizens United* controlled the analysis. *Id.* at 516–17.

51. The Court's holdings in these cases could not be clearer: The First Amendment protects corporations and other artificial entities, and neither federal nor state law may abridge those rights. Accordingly, States may not burden or prohibit speech because it arises from a corporation or condition speech rights on eschewing the corporate form.

## II. HAWAI‘I ENACTED ACT 11 TO CENSOR SPEECH BY CORPORATIONS AND OTHER ASSOCIATIONS

52. On May 14, 2026, Hawai‘i's Governor signed into law Act 11, styled as an act "relating to the powers of artificial persons." *See* Act 11, *available at* https://tinyurl.com/45xv8cfb.

53. Act 11 rests on the very premise that the Supreme Court's First Amendment precedents have repeatedly rejected. The Act declares "that the State

possesses plenary authority to determine the powers and capacities of artificial persons it creates," *id.* § 1—even though the Supreme Court has already called that position "extreme," *Bellotti*, 435 U.S. at 778 n.14.

54. Defendant Lopez even told the Legislature during consideration of Act 11 that the law would be "likely impossible to defend" unless *Citizens United* was "overturned." House Hearing 5. Defendant Lopez "strongly oppose[d]" Act 11, *ibid.*, and warned that its passage "could result in substantial legal fees for the State's taxpayers," *id.* at 7.

55. Act 11 forbids all Hawaiʻi and foreign corporations as well as other organizations from engaging in "election activity" and "ballot-issue activity." These terms are broad and defined to encompass essentially any form of support or opposition to candidates or ballot initiatives. Election activity "means paying, contributing, or expending money or anything of value to support or oppose a candidate, political committee, or political party." Act 11 §§ 4 (HRS § 414-3), 8 (HRS § 414D-14), 17 (HRS § 425E-102), 19 (HRS § 428-101), 22 (HRS § 429-1). Ballot-issue activity "means paying, contributing, or expending money or anything of value to support or oppose a constitutional amendment, county charter amendment, or other ballot question after it has been formally certified or submitted to the electors of the State or any county." *Ibid.* Both definitions contain carveouts for "any bona fide news story, commentary, or editorial distributed through the

facilities of a broadcasting station or of any print, online, or digital newspaper, magazine, blog, or other periodical publication, unless the broadcasting, print, online, or digital facility is owned or controlled by a candidate, political committee, or political party." *Ibid.*

56. Act 11's prohibitions are broader than Hawai'i's existing campaign-finance categories. Existing Hawai'i law limits "independent expenditures" to express advocacy and limits "electioneering communications" by timing and other factors. *See* HRS § 11-302. Act 11 contains no comparable express-advocacy, timing, or other limitation. Act 11 restricts independent expenditures and electioneering communications, as well as additional political speech that does not meet these existing definitions but may still "support or oppose" a candidate or ballot initiative.

57. Act 11 prohibits election activity and ballot-issue activity for virtually every voluntary association imaginable under state law. These include corporations, Act 11 §§ 5 (HRS § 414-41(a)), 6 (HRS § 414-42(b), (d)–(e)), 7 (HRS § 414-44(d)); nonprofit corporations, *id.* §§ 8 (HRS § 414D-14), 9 (HRS § 414D-51(a)), 10 (HRS § 414D-52(b), (d)), 11 (HRS § 414D-54(d)); professional corporations, *id.* § 12 (HRS § 415A); agricultural cooperative organizations, *id.* § 13 (HRS § 421); consumer cooperative associations, *id.* § 14 (HRS § 421C); limited-equity housing cooperatives, *id.* § 15 (HRS § 421H); limited liability partnerships, *id.* § 16 (HRS

§ 425(b)–(c)); limited partnerships, *id.* §§ 17 (HRS § 425E-102), 18 (HRS § 425E-105(b), (d)–(e)); limited-liability companies, *id.* §§ 19 (HRS § 428-101), 20 (HRS § 428-111(b), (d)–(e)); and unincorporated nonprofit associations, *id.* §§ 21 (HRS § 429(b), (d)–(e)), 22 (HRS § 429-1). Act 11 thus extends its political-speech prohibition to virtually every form of voluntary association, from businesses and partnerships to charities, trade associations, labor unions, and cooperatives.

58. Act 11 declares "election activity" and "ballot-issue activity" "ultra vires and void," invalidates organizational documents that purport to authorize such activity, and treats continued legal existence as a "conditional grant" subject to complete withdrawal. *See* Act 11 §§ 6 (HRS § 414-42(a), (d)–(e)), 10 (HRS § 414D-52(a), (d), (f)), 16 (HRS § 425(c)), 18 (HRS § 425E-105(e)), 20 (HRS § 428-111(e)), 21 (HRS § 429(e)).

59. Act 11 expressly applies its political-speech prohibition to non-Hawai'i entities created under the laws of other States and the District of Columbia. Act 11 §§ 6 (HRS § 414-42(f)), 10 (HRS § 414D-52(e)), 16 (HRS § 425(d)), 18 (HRS § 425E-105(f)), 20 (HRS § 428-11(f)), 21 (HRS § 429(f)). That expansion is especially remarkable because Hawai'i's preexisting law recognizes that authorization to transact business "does not authorize this State to regulate the organization or internal affairs of a foreign corporation." HRS §§ 414-435(c), 414D-275(c).

60. As Defendant Lopez explained during the Legislature's consideration of Act 11, the statute's extension of its political-speech prohibition to non-Hawai'i corporations "contradicts its own theory" because "Hawaii has no ability to define the corporate powers of foreign corporations." House Hearing 6–7; *see also id.* at 7 ("this is logically and legally fatal").

61. Hawai'i enforces its political-speech censorship with drastic sanctions. Act 11 empowers Defendants, the Attorney General and the Director of Commerce and Consumer Affairs, to punish organizations that dare engage in election activity or ballot-issue activity with (1) temporary suspension of operations, (2) a ban on government contracts, (3) revocation of tax-exempt status, where applicable, (4) designation of the organization as non-compliant and the imposition of additional reporting obligations, (5) revocation of the organization's ability to operate in the State, and (6) involuntary dissolution. Act 11 §§ 23–24.

62. Act 11 also restricts speech through an inseverability clause that purports to strip artificial persons of their ability to operate in the State entirely if Act 11's censorship provisions are "held invalid." Act 11 § 25(c). The inseverability clause thus operates, like the rest of Act 11, as a means to prohibit and restrict speech and to condition the corporate form on the surrender of First Amendment rights.

63. Act 11 "shall take effect on July 1, 2027." Act 11 § 27.

64. In sum, Act 11 does not regulate the manner of corporate political speech. It extinguishes the power to speak on certain topics and viewpoints, enforces that content- and viewpoint-based prohibition with significant corporate penalties up to involuntary dissolution, and does so in direct defiance of binding Supreme Court precedent interpreting the First and Fourteenth Amendments.

65. Act 11's supporters cheered this law as a way to restore "a level playing field where the size of a bank account doesn't determine the volume of a person's voice." *Relating to the Powers of Artificial Persons: Hearing on S.B. 2471 Before the S. Comm. On Com. and Consumer Protection*, 33rd Leg., Reg. Sess. 103 (Haw. 2026) (statement of Justin Hughey, an individual), *available at* https://tinyurl.com/3ne2j8m4; *see id.* at 9, 11, 23, 50–51 (testimony of Tom Moore, Senior Fellow for Democracy Policy, Ctr. for Am. Progress) (similar); *id.* at 122 (testimony of Pamela Elders, an individual) (similar). But the First Amendment does not tolerate governmental leveling of speakers. *See NRSC*, 146 S. Ct. at 2418; *Citizens United*, 558 U.S. at 349. The First Amendment promises a free exchange of ideas, not a restricted exchange amongst governmentally approved and calibrated speakers.

66. Act 11 provides that if the provisions regulating foreign artificial persons are limited, invalidated, or enjoined "in any respect, including, as applied to any person, entity, or circumstance," then "the entirety of [Act 11] shall be deemed

invalid and have no force or effect." Act 11 §§ 6 (HRS § 414-42(f)), 10 (HRS § 414D-52(e)), 16 (HRS § 425(d)), 18 (HRS § 425E-105(f)), 20 (HRS § 428-111(f)). Because, at minimum, Act 11's regulation of speech by foreign entities is unconstitutional, the entirety of Act 11 is invalid and without force or effect.

**FIRST CLAIM FOR RELIEF**
**Unconstitutional Restrictions on the Freedom of Speech**
**(U.S. Const., amends. I, XIV; 28 U.S.C. § 2201(a); 42 U.S.C. § 1983; and *Ex Parte Young* Equitable Cause of Action)**

67. The Chamber alleges and incorporates by reference all other paragraphs in this Complaint.

68. The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I.

69. First Amendment protection extends to corporations. *Citizens United*, 558 U.S. at 342. Corporations are themselves "persons" within the meaning of the Fourteenth Amendment. *Grosjean*, 297 U.S. at 244. They are also associations of natural persons who join together to advance shared objectives. *Hobby Lobby*, 573 U.S. at 706; *NAACP*, 357 U.S. at 460. Restrictions on the political speech of those organizations therefore burden not only the freedoms of speech and association enjoyed by the corporation itself, but also the ability of individuals to associate for expressive purposes.

70. The U.S. Supreme Court has long rejected the "extreme position" that "corporations, as creatures of the State, have only those rights granted them by the State." *Bellotti*, 435 U.S. at 778 n.14. There is "no support in the First or Fourteenth Amendment, or in the decisions of th[e] [Supreme] Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation." *Id.* at 784.

71. Act 11 imposes content-, viewpoint-, and speaker-based restrictions on political speech in violation of the First and Fourteenth Amendments. It applies content-based restrictions because it singles out speech concerning elections, candidates, political parties, and ballot measures, and it discriminates based on speakers with disfavored viewpoints because it subjects only corporations and other artificial persons to its speech restriction. By its terms, the statute strips those specific speakers of any power to engage in "election activity" and "ballot-issue activity," defined to include "paying, contributing, or expending money or anything of value to support or oppose" candidates, political parties, political committees, and ballot measures. Act 11 §§ 8 (HRS § 414D-14), 10 (HRS § 414D-52(a), (c)); *see also id.* § 10 (HRS 414D-52(e)) (extending to "foreign corporation[s]"). Those activities are "core political speech" for which First Amendment protection "is 'at its zenith.'" *Buckley*, 525 U.S. at 183 (ballot-issue speech); *see also FEC v. Cruz*, 596 U.S. 289, 302 (2022) (similar) (election speech). Act 11 does not merely

regulate that speech, or merely restrict its time, place, or manner. It categorically prohibits it.

72. Act 11 reinforces its speech prohibition with extraordinary sanctions. An entity that engages in the prohibited speech may be subjected to penalties including suspension of its authority to do business in Hawaiʻi, loss of state tax benefits, revocation of its charter or certificate of authority, and even involuntary dissolution.

73. Act 11's discriminatory character is confirmed by its content- and viewpoint-based exemption for media entities. While the statute prohibits most corporations and other artificial persons from engaging in election and ballot-issue activity, it expressly permits certain newspapers, broadcasters, blogs, magazines, and other media entities to continue publishing news stories, commentary, and editorials concerning candidates and ballot measures. *See* Act 11 § 8 (HRS § 414D-14). Hawaiʻi thus permits favored corporate speakers to engage in political advocacy while prohibiting disfavored corporate speakers from doing the same. *Accord Citizens United*, 558 U.S. at 352–53 ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers. . . . The law's exception for media corporations is . . . a further, separate reason for finding this law invalid." (citations omitted)).

74. Hawai‘i has no legitimate interest in suppressing political speech to equalize the relative voices of speakers. The Supreme Court has repeatedly held that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *NRSC*, 146 S. Ct. at 2418 (cleaned up). Nor may Hawai‘i dictate "the subjects about which persons may speak" or "the speakers who may address a public issue." *Bellotti*, 435 U.S. at 784–85.

75. Hawai‘i purports to justify its speech prohibition based upon its "belie[f] that the powers conferred on an artificial person are separate and distinct from the rights retained by natural persons." Act 11 § 1. But again, the Supreme Court has squarely and repeatedly "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United*, 558 U.S. at 343.

76. Hawai‘i's asserted rationale also fails on its own terms. Act 11 restricts foreign entities that Hawai‘i did not create and whose powers Hawai‘i has no authority to define. The law's application to those entities confirms that Act 11 is a speech restriction, not a mere definition of corporate powers.

77. Act 11 cannot survive First Amendment scrutiny. It imposes a complete ban rather than a contribution limit, campaign-finance disclosure

requirement, or other regulation. It is overinclusive because it reaches foreign entities Hawai‘i did not create, and underinclusive because favored media corporations remain free to engage in otherwise prohibited political advocacy. Hawai‘i has identified no compelling governmental interest in banning this speech. Indeed, Act 11 serves no legitimate, non-censorship governmental interest whatsoever, let alone a compelling one. And even if Hawai‘i possessed a compelling interest in regulating some corporate political activity, Act 11 is not narrowly tailored to advancing any such interest.

78. Act 11 therefore violates the First and Fourteenth Amendments to the United States Constitution on its face and as applied to the Chamber.

**SECOND CLAIM FOR RELIEF**
**Unconstitutional Conditions Restricting the Freedom of Speech**
**(U.S. Const., amends. I, XIV; 28 U.S.C. § 2201(a); 42 U.S.C. § 1983; and *Ex Parte Young* Equitable Cause of Action)**

79. The Chamber alleges and incorporates by reference all other paragraphs in this Complaint.

80. Hawai‘i may not condition the receipt or retention of a governmental benefit on the surrender of constitutional rights, especially rights protected by the First Amendment. *See, e.g.*, *Agency for Int’l Dev. v. Alliance for Open Society Int’l, Inc.*, 570 U.S. 205, 214 (2013); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

81. The corporate form offers benefits “such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets.” *Citizens*

*United*, 558 U.S. at 351. "It is rudimentary that the State cannot exact as the price of those special advantages the forfeiture of First Amendment rights." *Ibid.*; *see also Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021) (California could not condition entities' operation within that State on sacrifice of associational freedoms).

82. Act 11 expressly treats the corporate form and the authority to do business in Hawaiʻi as a "conditional grant of legal status" that remains subject to withdrawal by the State. *See* Act 11 § 10 (HRS § 414D-52(a)) ("The creation and continued existence of a corporation shall not be deemed a right but shall be a conditional grant of legal status by this State and shall remain subject to complete withdrawal at any time."); *see id.* (HRS 414D-52(e)) ("A foreign corporation shall have no greater rights or privileges than, and shall be subject to the same duties, restrictions, penalties, and liabilities as, a domestic corporation").

83. Act 11 then defines the forfeiture of political-speech rights as a condition of receiving and retaining that benefit. Specifically, the statute conditions the receipt and retention of limited liability, perpetual existence, authority to transact business, and other state-conferred benefits on an entity's agreement to refrain from engaging in "election activity" and "ballot-issue activity" protected by the First Amendment. *See* Act 11 § 10 (HRS § 414D-52(b)) ("a corporation … shall not have the power to expend moneys on or participate in any election activity or ballot-issue activity"), *id.* (§ 414D-52(d)) ("articles, bylaws, or other organizational documents

of the corporation purporting to grant or confer any power to directly or indirectly engage in election activity or ballot-issue activity shall be void"), *id.* § 11 (HRS § 414D-54(d)) ("acts that constitute election activities or ballot-issue activities … are ultra vires and void").

84. Act 11 enforces that unconstitutional condition by threatening entities that engage in constitutionally protected political speech with the withdrawal of those benefits, including suspension of their authority to operate, revocation of tax benefits, revocation of their charter or certificate of authority, and involuntary dissolution. *See* Act 11 § 10 (HRS § 414D-52(f)); *id.* §§ 23–24. And it extends those unconstitutional conditions and sanctions to foreign corporations, *id.* § 10 (HRS § 414D-52(e)), which "contradicts [the State's] own theory" because "Hawaii has no ability to define the corporate powers of foreign corporations." House Hearing 6–7.

85. Hawai'i may not accomplish indirectly through conditions on incorporation and authority to transact business what it could not accomplish directly through a prohibition on protected speech. That is particularly so where, as here, the condition has no reasonable connection to any legitimate government interest. Because Act 11 conditions the receipt and retention of governmental benefits on the surrender of rights protected by the First and Fourteenth Amendments, it violates the

unconstitutional-conditions doctrine and is unconstitutional on its face and as applied to the Chamber.

## THIRD CLAIM FOR RELIEF
## First Amendment Overbreadth
## (U.S. Const., amends. I, XIV; 28 U.S.C. § 2201(a); 42 U.S.C. § 1983; and *Ex Parte Young* Equitable Cause of Action)

86. The Chamber alleges and incorporates by reference all other paragraphs in this Complaint.

87. Act 11 broadly prohibits corporations and other artificial entities from engaging in "election activity" and "ballot-issue activity," including speech concerning candidates, political parties, political committees, constitutional amendments, county charter amendments, and other ballot measures.

88. Those prohibitions encompass substantial amounts of constitutionally protected speech, including speech expressly protected by *Bellotti* and *Citizens United*.

89. Act 11 repeats materially identical prohibitions on political advocacy across multiple organizational forms.

90. Accordingly, Act 11 prohibits a substantially greater amount of protected speech than could be justified under any legitimate sweep Act 11 may possess and is therefore facially unconstitutional and overbroad.

## PRAYER FOR RELIEF

**WHEREFORE**, the Chamber respectfully requests that this Court enter judgment in its favor and against Defendants, as follows:

A. Enter a declaratory judgment against Defendants that Act 11 and/or individual provisions of Act 11 are unconstitutional.

B. Enter a declaratory judgment against Defendants that Act 11 and/or individual provisions of Act 11 are invalid and without force or effect.

C. Enter preliminary and permanent injunctive relief preventing the implementation and enforcement of Act 11 and/or individual provisions of Act 11.

D. Grant the foregoing relief facially and/or as applied to the Chamber.

E. Grant the Chamber attorney's fees, costs, and interest, under 42 U.S.C. § 1988 and all other applicable laws.

F. Grant such further and additional relief as this Court deems just and proper.

DATED: Honolulu, Hawai‘i, September 24, 2026.

*/s/ Trever K. Asam*
TREVER K. ASAM
LINDSAY N. MCANEELEY
CALEB P. BURNS*
JEREMY J. BROGGI*
JONATHAN D. URICK*
KEVIN R. PALMER*

Attorneys for Plaintiff
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
* *Pro Hac Vice* Motions Forthcoming