UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ANNE E. LOPEZ, in her official capacity as Attorney General of Hawaiʻi, and NADINE ANDO, in her official capacity as Director of Hawaiʻi Department of Commerce and Consumer Affairs,<br>Defendants. | CIVIL NO. 1:26-cv-00497-JAO-KJM<br>**MEMORANDUM IN SUPPORT OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA'S MOTION FOR A PRELIMINARY INJUNCTION** |

**MEMORANDUM IN SUPPORT OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

BACKGROUND ........................................................................................... 2

STANDARD OF REVIEW ........................................................................... 6

STANDING ................................................................................................... 6

ARGUMENT ................................................................................................. 8

I. The Chamber Is Likely To Succeed On Its First Amendment Claim ... 8

A. Act 11 Categorically Bans The Chamber's Core Political Speech ........................................................................................... 8

B. Act 11 Is Subject To Strict Scrutiny Because It Discriminates Based On Content, Speaker Identity, and Viewpoint ............... 10

C. Hawai'i's Asserted Interest Has Been Rejected By The Supreme Court ........................................................................................ 13

D. Act 11 Is Not Tailored To Any Legitimate State Interest ........ 17

II. The Chamber Is Likely To Succeed On Its Unconstitutional-Conditions Claim ................................................................................. 19

III. The Chamber Is Likely To Succeed On Its Overbreadth Claim ......... 23

IV. The Remaining Factors Favor Injunctive Relief ................................. 26

CONCLUSION ............................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 15

*Agency for International Development v. Alliance for Open Society International, Inc.*,
570 U.S. 205 (2013) .......... 20

*American Encore v. Fontes*,
152 F.4th 1097 (9th Cir. 2025) .......... 7

*American Tradition Partnership, Inc. v. Bullock*,
567 U.S. 516 (2012) .......... 15

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) .......... 15, 22, 23, 24

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) .......... 19

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999) .......... 9

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 14

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......... 15

*Carson as next friend of O. C. v. Makin*,
596 U.S. 767 (2022) .......... 20

*Chiles v. Salazar*,
607 U.S. 627 (2026) .......... 10, 11, 18

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 10, 12, 14, 15, 19, 21, 25, 27

*CTS Corp. v. Dynamics Corp. of America*,
481 U.S. 69 (1987).....................................................................................17

*Davis v. FEC*,
554 U.S. 724 (2008)...................................................................................14

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982)...................................................................................17

*FEC v. Beaumont*,
539 U.S. 146 (2003)...................................................................................25

*First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. 174 (2026)...................................................................................22

*First Natonal Bank of Boston v. Bellotti*,
435 U.S. 765 (1978)...................................................................10, 14, 24, 27

*FTC v. American Tobacco Co.*,
264 U.S. 298 (1924)...................................................................................15

*Grenning v. Key*,
__ F.4th __, No. 23-3018, 2026 WL 2509407 (9th Cir. Aug. 26,
2026) .........................................................................................................8

*Healy v. James*,
408 U.S. 169 (1972)...................................................................................21

*Hubbard v. City of San Diego*,
139 F.4th 843 (9th Cir. 2025) ....................................................................27

*Imperial Sovereign Court of Montana v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) ...............................................................6, 7, 10

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022)...................................................................................13

*King County v. Azar*,
320 F. Supp. 3d 1167 (W.D. Wash. 2018) .................................................26

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ....................................................................27

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....27

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024)....7, 8

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*,
692 F.3d 864 (8th Cir. 2012)....26

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....23

*NAACP v. Alabama*,
357 U.S. 449 (1958)....15, 22

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024)....24

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025)....24

*Northwest Association Independent Schools v. Labrador*,
166 F.4th 1148 (9th Cir. 2026)....6, 27

*NRSC v. FEC*,
146 S. Ct. 2404 (2026)....9, 10, 13, 14, 18, 19

*Reed v. Town of Gilbert, Arizona*,
576 U.S. 155 (2015)....11

*RK Ventures, Inc. v. City of Seattle*,
307 F.3d 1045 (9th Cir. 2002)....10

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....11, 12

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)....7

*Terral v. Burke Construction Co.*,
257 U.S. 529 (1922)....22

*Thompson v. Hebdon*,
7 F.4th 811 (9th Cir. 2021) ....................................................................17

*Virginia v. American Booksellers Association, Inc.*,
484 U.S. 383 (1988)...................................................................................7

*Washington Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) ....................................................................11

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ....................................................................27

**Statutes**

S.B. No. 2471, 33rd Leg., Reg Sess.,
2026 Haw. Sess. Laws Act 11 ..................................... 3, 4, 7, 8, 9, 11, 14, 16, 19
.......................................................................... 20, 21, 22, 23, 24, 25

Haw. Rev. Stat. § 414-432 ..........................................................................21

Haw. Rev. Stat. § 414D-271 ........................................................................21

Haw. Rev. Stat. § 414D-272 ........................................................................21

U.S. Const. amend. I ......................................................................................8

**Other Authorities**

*Hearing on S.B. 2471 before the Hawai'i House Committee on Judiciary and Hawaiian Affairs*, 33rd Leg., Reg. Sess. 4 (Haw. 2026), https://tinyurl.com/43r8zbte .........................................................5, 12, 13

*Hearing on S.B. 2471 Before the Hawai'i Senate Committee on Commerce and Consumer Protection*, 33rd Leg., Reg. Sess. 103 (Haw. 2026), https://tinyurl.com/3ytu2umf.............................................4, 12, 13

Letter Ruling, Petition No. 26-03: An Act to Limit Artificial-Person Powers (Mass. Att'y Gen. Sept. 2, 2026), https://tinyurl.com/8pa9kbkv ....................................................................5

Press Release, Hawai'i Senate Majority, Governor Signs Senate Bill 2471 Into Law To Limit Corporate Political Spending In Hawai'i (May 14, 2026), https://tinyurl.com/2hbbncxk....................................................5

# INTRODUCTION

Hawaiʻi has attempted an end run around settled First Amendment law. After the Supreme Court held in *Bellotti* and *Citizens United* that the First Amendment protects corporate political advocacy, Hawaiʻi enacted Act 11 to try and accomplish indirectly what Hawaiʻi cannot do directly. The State claims authority to redefine the powers of corporations and thereby strip them of the capacity to engage in election and ballot-issue advocacy. But constitutional rights do not disappear when individuals associate through a corporation. And a State cannot evade the First Amendment by imposing a speech ban as a limitation on corporate powers.

Act 11 is unconstitutional. Most obviously, it bans core political speech. The Act prohibits corporations and other entities from supporting or opposing candidates, political parties, political committees, and ballot measures. It discriminates based on content, viewpoint, and speaker identity. It rests on an asserted governmental interest the Supreme Court has repeatedly rejected: reducing the influence of disfavored speakers so that other voices carry greater relative weight. And it is not remotely tailored, sweeping in foreign corporations Hawaiʻi did not create, while exempting favored media corporations and political committees.

The Act also independently fails as a textbook unconstitutional condition on the corporate form. Hawaiʻi expressly declares that corporate existence and

authority to do business remain merely conditional privileges subject to withdrawal. The State then conditions those privileges on forfeiting the constitutional right to engage in political advocacy. But the First Amendment prohibits Hawai‘i from conditioning incorporation or authority to do business on the surrender of speech rights.

Ultimately, Act 11 rests on a proposition the Supreme Court has rejected for decades: that government may suppress political speech because it dislikes the identity of the speaker or believes that speaker has become too influential. Because Plaintiff is overwhelmingly likely to succeed on the merits, and will suffer irreparable harm in the interim, the Court should preliminarily enjoin Act 11's enforcement before the law takes effect.

## BACKGROUND

The Chamber of Commerce of the United States of America is the nation's largest business organization. It regularly communicates with voters and public officials concerning economic policy and government regulation. *See* Imel Decl. ¶¶ 4-11. As part of those efforts, the Chamber intends to communicate with Hawai‘i voters regarding candidates for Hawai‘i office, supporting or opposing candidates by expressing approval or disapproval of candidates' positions on free-enterprise issues, including Hawai‘i Act 11 itself. Imel Decl. ¶¶ 12-16.

Act 11 purports to ban that planned advocacy. Enacted in 2026 and scheduled to take effect on July 1, 2027, Act 11 is styled as a law "relating to the powers of artificial persons." S.B. No. 2471, 33rd Leg., Reg Sess., 2026 Haw. Sess. Laws Act 11, *available at* https://tinyurl.com/45xv8cfb. The statute rests on the premise that corporations possess only those powers the State chooses to confer. The Legislature declared that Hawaiʻi maintains "plenary authority to determine the powers and capacities of the artificial persons it creates" and enacted Act 11 to "restate and limit" those powers. § 1.

Act 11 then eliminates political advocacy from the powers of covered entities. The statute provides that a corporation "shall not have the power to expend moneys on or participate in any election activity or ballot-issue activity." § 10 (§ 414D-52(b)).[1] It defines "election activity" broadly as "paying, contributing, or expending money or anything of value to support or oppose a candidate, political committee, or political party." § 8 (§ 414D-14). "Ballot-issue activity" is similarly defined as supporting or opposing a ballot question. *Ibid.* The Act further provides that such activities are "ultra vires and void" and that corporate documents purporting to authorize them are likewise void. § 10 (§ 414D-52(d), (f)).

[1] Citations are generally to the nonprofit-corporation provisions applicable to the Chamber. Act 11 imposes materially identical restrictions throughout the statute on other "artificial persons."

The statute extends beyond Hawai‘i-chartered corporations. Act 11 expressly provides that foreign corporations transacting business or owning property in Hawai‘i face the same restrictions as domestic corporations. § 10 (§ 414D-52(e)). Indeed, any foreign corporation that "directly or indirectly undertakes, finances, or directs election activity or ballot-issue activity in the State" is "conclusively deemed to be transacting business in the State" and subject to the Act's restrictions and enforcement regime. *Ibid.*

That enforcement regime is severe. The Attorney General and Director of Commerce and Consumer Affairs may impose a range of sanctions for engaging in prohibited political advocacy, including suspension or revocation of the entity's authority to operate in Hawai‘i, exclusion from state contracts, revocation of tax benefits, additional reporting requirements, and involuntary dissolution. §§ 23-24 (§§ A-1, B-1).

The legislative record reflects a concern that corporations exercise excessive influence over public debate and elections. Supporters repeatedly described the law as a means of restoring "a level playing field where the size of a bank account doesn't determine the volume of a person's voice." *Hearing on S.B. 2471 Before the Hawai‘i Senate Committee on Commerce and Consumer Protection*, 33rd Leg., Reg. Sess. 103 (Haw. 2026), https://tinyurl.com/3ytu2umf ("Senate Hearing"); *see also, e.g.*, *Hearing on S.B. 2471 before the Hawai‘i House Committee on Judiciary and*

*Hawaiian Affairs*, 33rd Leg., Reg. Sess. 4 (Haw. 2026), https://tinyurl.com/43r8zbte ("House Hearing") ("This bill is intended … to limit corporate political spending so Hawaiʻi's election process is shaped more by individual voters than by corporate money"), 15 ("Passage of SB 2471 can help ensure that political speech and influence in Hawaiʻi remain grounded in the voices of individuals and communities, rather than being dominated by corporate treasuries"). Other supporters urged enactment to prevent corporations from "dominat[ing]" politics, to "reduc[e] the influence of corporate money in elections," give "more weight to the voices of residents and less to large organizations with financial power," and ensure that elections are "driven by the voices of natural persons." House Hearing 4, 15, 18, 20. Act 11's sponsors said it would "reduce the influence of corporate money in elections." Press Release, Hawaiʻi Senate Majority, Governor Signs Senate Bill 2471 Into Law To Limit Corporate Political Spending In Hawaiʻi (May 14, 2026), https://tinyurl.com/2hbbncxk.

Notably, Defendant Attorney General Anne Lopez warned the Legislature that Act 11 was likely unconstitutional.[2] During the legislative process, she explained that the bill would "likely be subject to strict scrutiny" because it "removes

[2] The Massachusetts Attorney General recently rejected a materially similar proposal as violating the First Amendment. *See* Letter Ruling, Petition No. 26-03: An Act to Limit Artificial-Person Powers 2-3 (Mass. Att'y Gen. Sept. 2, 2026), https://tinyurl.com/8pa9kbkv.

only speech related to elections and ballot initiatives from a corporation's powers, while permitting a corporation to retain its ability to speak in other contexts." Ex. A, Attorney General Testimony Excerpt from House Hearing 2 ("Attorney General Testimony"). She further observed that Act 11's application to foreign corporations "contradicts its own theory." *Ibid.*

Despite those warnings, Hawai‘i enacted Act 11. Unless enforcement is enjoined before the statute's July 1, 2027, effective date, Act 11 will prevent the Chamber from engaging in planned advocacy concerning Hawai‘i candidates, elections, and public issues. The Chamber therefore seeks preliminary relief to preserve its First Amendment rights pending final judgment.

## STANDARD OF REVIEW

A preliminary injunction is warranted when the plaintiff shows: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Nw. Ass'n Indep. Schs. v. Labrador*, 166 F.4th 1148, 1156 (9th Cir. 2026) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

## STANDING

The Chamber has Article III standing. Courts apply standing requirements "less stringently" to "restrict[ion]s [on] "First Amendment rights." *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 834 (9th Cir. 2026) (cleaned up).

In "a pre-enforcement challenge" like this one, the plaintiff need only show that its intended speech is "arguably proscribed" by the challenged law and that "there exists a credible threat of prosecution thereunder." *Ibid.*; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014); *Am. Encore v. Fontes*, 152 F.4th 1097, 1113-19 (9th Cir. 2025).

Both requirements are satisfied. The Chamber intends to engage in communications that support or oppose candidates for Hawai'i office by praising or criticizing candidates' positions on Act 11 and other free-enterprise issues. Imel Decl. ¶¶ 12-16. Act 11 specifically prohibits these planned expenditures. §§ 8 (§ 414D-14), 10 (414D-52(b)).

Furthermore, Act 11 is a newly enacted law carrying severe penalties, and Hawai'i has not disavowed enforcement. That suffices to establish a credible enforcement threat. *See Knudsen*, 170 F.4th at 835-36; *Matsumoto v. Labrador*, 122 F.4th 787, 797-98 (9th Cir. 2024) (standing existed where statute was "of recent vintage" and the State had "never disavowed" enforcement). Indeed, the Chamber is already planning communications concerning future Hawai'i elections, and Act 11 presently chills those activities because the Chamber must now decide whether to alter, postpone, or forgo communications that Act 11 prohibits. Imel Decl. ¶¶ 18-19; *see Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (plaintiffs had standing for suit brought "before the statute became effective"). Because the

Chamber's injuries are caused by Act 11, they would be redressed by an injunction preventing its enforcement. *See Matsumoto*, 122 F.4th at 799-802.

## ARGUMENT

### I. The Chamber Is Likely To Succeed On Its First Amendment Claim

Act 11 bans core political speech; discriminates based on content, viewpoint, and speaker identity; rests on an illegitimate censorship interest the Supreme Court has repeatedly rejected; and is not narrowly tailored. The Chamber is likely to succeed on its First Amendment claim.

#### A. Act 11 Categorically Bans The Chamber's Core Political Speech

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Grenning v. Key*, __ F.4th __, No. 23-3018, 2026 WL 2509407, at *7 (9th Cir. Aug. 26, 2026) (quoting *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

Act 11 does precisely that. It expressly states that "a corporation operating under the jurisdiction of this State shall not have the power to expend moneys on or participate in any election activity or ballot-issue activity." § 10 (§ 414D-52(b)); *see ibid.* (§ 414D-52(e) (extending prohibition to any "foreign corporation" operating in Hawai'i)). And the statute defines "election activity" and "ballot-issue activity"

broadly, as "paying, contributing, or expending money or anything of value to support or oppose" either "a candidate, political committee, or political party" or "a constitutional amendment, county charter amendment, or other ballot question." § 8 (§ 414D-15). As these provisions make clear, Act 11 restricts core political speech whose source is a corporation. It is not a campaign-finance disclosure requirement, reporting obligation, or contribution limit. It is a flat prohibition on corporate political advocacy. Because the Chamber intends to engage in the very candidate-related advocacy that Act 11 defines as "election activity," Act 11 squarely prohibits its planned speech. *See* Imel Decl. ¶¶ 12-18.

The speech Act 11 bans lies at the heart of the First Amendment. "The First Amendment's protection of free speech has its 'fullest and most urgent application precisely to the conduct of campaigns for political office.'" *NRSC v. FEC*, 146 S. Ct. 2404, 2415 (2026). Speech about elections, candidates, political parties, and ballot issues is "core political speech" for which First Amendment protection "is 'at its zenith.'" *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999). Moreover, "[b]ecause 'virtually every means of communicating ideas in today's mass society requires the expenditure of money,' a 'restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by

restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.'" *NRSC*, 146 S. Ct. at 2412.

The fact that the Chamber is a corporation does not diminish its constitutional injury. "First Amendment protection extends to corporations." *Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (collecting cases). Corporations are "persons" within the meaning of the Fourteenth Amendment, entitled to protection from state abridgement of speech. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 779-80 & 780 n.15 (1978); *see RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1057 & n.7 (9th Cir. 2002). Corporations are also "associations of citizens" joining together to advance shared objectives. *Citizens United*, 558 U.S. at 349-56. Restrictions on corporate political speech therefore burden not only the First Amendment freedoms enjoyed by the corporation itself, but also the rights of the individuals who associate through the corporation for expressive purposes.

### B. Act 11 Is Subject To Strict Scrutiny Because It Discriminates Based On Content, Speaker Identity, and Viewpoint

Act 11 is content-based, aimed at disfavored speakers, and viewpoint-discriminatory. Content-based speech laws "are 'presumptively unconstitutional'" and subject to "strict scrutiny." *Chiles v. Salazar*, 607 U.S. 627, 640 (2026). Laws that target "disfavored speakers" are likewise suspect. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). "Discrimination based on viewpoint is 'an egregious form of content discrimination.'" *Knudsen*, 170 F.4th at 843. It is a "bedrock First

Amendment principle that the government cannot discriminate based on viewpoint." *Chiles*, 607 U.S. at 641 (cleaned up).

Act 11 is facially content-based. It permits corporations to speak about so-called "lawful activity," while expressly prohibiting them from discussing "election activity" and "ballot-issue activity." § 9 (§ 414D-51(a)); *see* § 10 (§ 414D-52(b)). It specifically prohibits expenditures that "support or oppose" "candidates," "political parties," "political committees," and "ballot measures," but not those that refer to other subjects. § 8 (§ 414D-14). Act 11 therefore "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) (statute was "content-based" where it "single[d] out … campaign-related speech").

The statute also "disfavors specific speakers." *Sorrell*, 564 U.S. at 564. It prohibits "corporation[s]" from speaking for or against candidates, political parties, political committees, and ballot measures. § 10 (§ 414D-52(b)). But it leaves "natural persons," § 1, media corporations, § 8 (§ 414D-14), and certain "candidate committees and noncandidate committees," § 10 (§ 414D-52(g)), free to engage in the same advocacy. Thus, although Act 11 would prohibit the Chamber from distributing communications approving or disapproving of candidates' positions on Act 11, it would permit a newspaper corporation to publish the same views. "[T]he

First Amendment generally prohibits the suppression of political speech based on the speaker's identity." *Citizens United*, 558 U.S. at 350. Act 11's "target[ing]" of specific "speakers and their messages for disfavored treatment" compounds Act 11's content-based burden. *See Sorrell*, 564 U.S. at 564-65.

Act 11 is viewpoint-discriminatory as well. Indeed, the legislative record confirms that Act 11 was enacted to reduce the influence of corporate speakers whose participation lawmakers viewed as "excessive." *E.g.*, Senate Hearing 85; House Hearing 183. The statute thus seeks to alter public debate by diminishing the voices of corporations while leaving other speakers free to address the same political questions. That means the speakers most likely to oppose Act 11 and defend corporate participation in politics—like the Chamber—are barred from engaging in candidate advocacy reflecting those views, while other speakers remain free to advocate the contrary position. *See* Imel Decl. ¶¶ 13-15. The alignment between the statute's operation and its purpose confirms that the law is viewpoint discriminatory. *See Sorrell*, 564 U.S. at 564-65, 571 (explaining "purpose" and "practical operation" of state statute showed that its speaker-based restriction was "viewpoint discriminatory"). Act 11's content-, speaker-, and viewpoint-based distinctions trigger strict scrutiny.

### C. Hawai‘i’s Asserted Interest Has Been Rejected By The Supreme Court

Because Act 11 is subject to strict scrutiny, Hawai‘i must prove that it “promote[s] a compelling interest” and uses “the ‘least restrictive means to further the articulated interest.’” *NRSC*, 146 S. Ct. at 2417. Hawai‘i must satisfy that burden by reference to interests it actually pursued, not those “hypothesized or invented post hoc in response to litigation.” *Id.* at 2418; *see also Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 543, n.8 (2022).

The Legislature’s censorship objective is clear. Act 11’s supporters repeatedly described the law as a means of restoring “a level playing field where the size of a bank account doesn’t determine the volume of a person’s voice.” Senate Hearing 103; *see* House Hearing at 4, 15. They urged enactment to “reduce the influence of corporate money in elections,” prevent corporations from “dominat[ing]” political discourse, and ensure that political influence remained grounded in “the voices of natural persons” rather than corporate entities. House Hearing 4, 15, 18, 20.

The legislative record repeatedly invokes the same justification: corporate political spending gives corporations excessive influence over public debate and should be curtailed so that the voices of individual voters carry greater relative weight. But the Supreme Court has squarely rejected that interest as illegitimate. “The ‘concept that government may restrict the speech of some elements of our

society in order to enhance the relative voice of others is wholly foreign to the First Amendment.'" *NRSC*, 146 S. Ct. at 2418. Such a rationale would permit government "to arrogate the voters' authority to evaluate the strengths" of competing arguments. *Davis v. FEC*, 554 U.S. 724, 742 (2008). The First Amendment instead "secure[s] 'the widest possible dissemination of information from diverse and antagonistic sources,'" *Buckley v. Valeo*, 424 U.S. 1, 49 (1976), including "corporation[s]," "association[s]," "union[s]," and "individual[s]," *Citizens United*, 558 U.S. at 349. As *Bellotti* explained, "[t]he people," not the government, bear "the responsibility for judging and evaluating the relative merits of conflicting arguments." 435 U.S. at 791. Act 11 therefore begins from a premise the Supreme Court has already condemned: that the State may suppress political speech because it believes some voices have become too influential.

Hawaiʻi attempts to avoid settled doctrine by asserting special authority over corporations and other artificial entities. The State "believes" it may regulate political speech by corporations because "the powers conferred on an artificial person are separate and distinct from the rights retained by natural persons." Act 11 § 1. But *Bellotti* rejected the "extreme position" that "the States are free to define the rights of their creatures without constitutional limit." 435 U.S. at 778 n.14. *Citizens United* likewise explained that "First Amendment protection extends to corporations," and "rejected the argument that political speech of corporations or

other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" 558 U.S. at 342-43. And when Montana urged the Supreme Court to disregard *Citizens United* and permit that State's restrictions on corporate political expenditures, the Court summarily reversed. *See American Tradition Partnership, Inc. v. Bullock*, 567 U.S. 516 (2012) (per curiam). The First Amendment does not permit States to suppress political advocacy by redefining the powers of corporations.

Indeed, Hawai'i's theory fails on its own terms. The State may define *within constitutional limits* the powers of entities it creates, but one of those limits is that First Amendment protections do not disappear when individuals join together through corporations and other associations. *Citizens United*, 558 U.S. at 349, 354, 356; *see also Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 606 (2021) (effective advocacy is enhanced by group association); *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) (same). As the Court recently explained, speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech." *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023). "A corporation," after all, "is simply a form of organization used by human beings to achieve desired ends." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). It is merely a means to manage "men's affairs." *FTC v. American Tobacco Co.*, 264 U.S. 298, 305-06 (1924). As Justice Holmes explained over a century ago,

"[t]he mere facts of carrying on a commerce not confined within State lines and of being organized as a corporation do not" "sweep all our traditions into the fire." *Ibid.* The State is therefore wrong to assume that corporate rights may be divorced from the rights of the individuals who associate through the corporation.

Nor is Hawaiʻi correct that Act 11 simply grants affirmative powers. The Act repeatedly uses prohibitory language, declaring that corporations "shall not have the power" to engage in election activity and that any such activity is "ultra vires and void." §§ 10 (§ 414D-52(b), (d), (f)), 11 (§ 414D-54(d)). Hawaiʻi's own Attorney General understood the point. During the legislative process, Defendant Attorney General Lopez explained that Act 11 "removes only speech related to elections and ballot initiatives from a corporation's powers, while permitting a corporation to retain its ability to speak in other contexts." Attorney General Testimony 2. She warned, therefore, that Act 11 "will likely be subject to strict scrutiny as a form of content-based speech restriction under the First Amendment." *Ibid.*

Act 11's incoherence is even more stark as applied to foreign corporations. *See* Act 11 § 10 (§ 414D-52(e)). As Defendant Attorney General Lopez also recognized, Act 11 "contradicts its own theory" because "Hawaiʻi has no ability to define the corporate powers of foreign corporations, which are governed by the state laws where they are incorporated." Attorney General Testimony 2. Lopez further explained that the legislation "does not account for how Hawaiʻi can regulate the

speech of foreign corporations when it does not grant the powers of those corporations," a defect she described as "logically and legally fatal." *Id.* at 2-3.

The Attorney General's conclusion follows from settled corporate-law principles. "No principle of corporation law and practice is more firmly established," *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 89 (1987), than that "which recognizes that only one State should have the authority to regulate a corporation's internal affairs," *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982). If Act 11 truly operated only by defining the powers of entities Hawai'i creates, there would be no basis for applying it to foreign corporations at all. Nor may Hawai'i justify such restrictions based on concerns about the influence of nonresident speakers. *See Thompson v. Hebdon*, 7 F.4th 811, 825-26 (9th Cir. 2021) (rejecting Alaska's "self-governance" rationale as "a re-branding of the interest of combating influence and access that the Supreme Court has squarely rejected"). The Act's extension to non-Hawaii entities confirms what its operative language already reveals: Act 11 is an unconstitutional restriction on political speech, not a permissible exercise in corporate housekeeping.

### D. Act 11 Is Not Tailored To Any Legitimate State Interest

Even if Hawai'i had asserted a compelling governmental interest for Act 11, it would fail strict scrutiny because it is radically untailored to any conceivable such interest. Because this law burdens core political speech, Hawai'i must prove it is

"the least restrictive means to further the articulated interest." *NRSC*, 146 S. Ct. at 2417 (cleaned up); *see Chiles*, 607 U.S. at 640.

To start, Act 11 is a radically overinclusive ban on corporate political spending. The statute is not a campaign-finance disclosure requirement or contribution limit. Instead, it altogether forbids corporations from engaging in election and ballot-issue advocacy. *See* section I.A., *supra*. Hawai'i's choice of a complete prohibition, rather than any of the numerous less restrictive tools traditionally used in the campaign-finance context, is an obvious tailoring flaw.

Assuming *arguendo* that Hawai'i had a compelling governmental interest in defining the powers of entities it creates notwithstanding constitutional limits, *but see* section I.C., *supra*, this law would remain significantly overinclusive. Restricting the speech of *foreign* corporations does not further Hawai'i's asserted interest in defining the rights of Hawai'i-chartered entities. If anything, respect for the principle that state law generally defines corporate powers counsels *against* restricting the powers of non-Hawai'i entities.

The Act is also underinclusive because favored media corporations remain free to engage in political advocacy. Act 11 broadly prohibits corporations from engaging in "election activity" and "ballot-issue activity," yet it simultaneously

exempts "bona fide news" organizations from those restrictions. § 8 (§ 414D-14).[3] If corporate political advocacy is genuinely so harmful that Hawaiʻi may prohibit it, there is no apparent reason why newspaper corporations, broadcasting companies, online publications, and other media corporations may continue engaging in the very same advocacy. The Supreme Court identified a similar flaw in *Citizens United*, observing that Congress could not plausibly justify a sweeping restriction on corporate political speech while simultaneously exempting media corporations from that restriction. *See* 558 U.S. at 352-54. Such underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011); *accord NRSC*, 146 S. Ct. at 2423 n.5. Act 11's favored treatment of media corporations therefore confirms what its overinclusive treatment of foreign corporations already suggests: the statute bears little relationship to the interest it purports to serve.

## II. THE CHAMBER IS LIKELY TO SUCCEED ON ITS UNCONSTITUTIONAL-CONDITIONS CLAIM

The Chamber is likely to succeed for a second, independent reason: Act 11 is a textbook unconstitutional condition. Hawaiʻi "may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he

---

[3] The Act contains a similar carveout for certain "candidate committees" and "noncandidate committees," § 10 (§ 414D-52(g)), further underscoring its underinclusiveness.

has no entitlement to that benefit." *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 214 (2013) (cleaned up); *see Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 778 (2022). Yet Act 11 conditions valuable state-conferred benefits on the surrender of First Amendment rights.

Act 11 expressly adopts a conditions-based framework. It provides that corporate existence and authority to do business are not "a right," but "a conditional grant of legal status" that is "subject to complete to withdrawal" by Hawai'i "at any time." § 10 (§ 414D-52(a)). Act 11 then conditions such charter privileges, grant of limited liability, authority to transact business, and other state-conferred benefits on a corporation's forfeiture of its constitutional rights to engage in "election activity" and "ballot-issue activity." *Ibid.* (§ 414D-52(b), (d), (f)). "[F]oreign corporation[s]," Act 11 further declares, "shall be subject to the same duties, restrictions, penalties, and liabilities as, a domestic corporation." *Ibid.* (§ 414D-52(e)). A corporation that engages in such advocacy risks loss of those benefits and, for Hawai'i-chartered entities, dissolution. § 23 (§ A-1). Act 11 thus presents corporations with precisely the choice the unconstitutional-conditions doctrine forbids: surrender First Amendment rights or forfeit valuable governmental benefits.

The Supreme Court has squarely rejected the notion that a State may condition the benefits of the corporate form on the surrender of First Amendment freedoms. Although incorporation provides certain advantages, "[i]t is rudimentary that the

State cannot exact as the price of those special advantages the forfeiture of First Amendment rights." *Citizens United*, 558 U.S. at 351; *cf. Healy v. James*, 408 U.S. 169, 176-77 (1972) (holding "official recognition" by government was a protected benefit). The unconstitutional-conditions doctrine forecloses the bargain Act 11 seeks to impose.

The same doctrine forecloses the Act's application to non-Hawai'i corporations, including the Chamber. Under Hawai'i corporate law, "A foreign corporation may not transact business in this State until it obtains a certificate of authority" from the State. Haw. Rev. Stat. § 414D-271(a). Act 11 provides that an entity engaged in "election activity" or "ballot-issue activity" "shall be conclusively deemed to be transacting business in the State," § 10 (§ 414D-52(e)), and, further, that these are "ultra vires act[s]" that warrant "[r]evocation of the entity's … certificate … authorizing the entity to … transact business in the State," § 23 (§ A-1(5)); § 10 (§ 414D-52(f)).[4] Put differently, Hawai'i will deny speakers the right to do business in the State because they engage in protected political advocacy.

The Supreme Court has repeatedly rejected such efforts by States to condition an organization's ability to operate within a State on the surrender of constitutional

[4] A foreign entity whose certificate is revoked also faces collateral legal consequences, including inability to maintain proceedings in Hawai'i courts, as well as statutory fees and penalties. Haw. Rev. Stat. §§ 414D-272 (nonprofits), 414-432 (business corporations).

rights. In *Terral v. Burke Construction Co.*, 257 U.S. 529 (1922), the Court expressly held that "a state may not, in imposing conditions upon the privilege of a foreign corporation's doing business in the state, exact from it a waiver of the exercise of its constitutional right[s]." *Id.* at 532. In *NAACP v. Alabama*, and again in *Americans for Prosperity Foundation*, the Court applied that principle to First Amendment rights, invalidating Alabama's and then California's attempts to require organizations to disclose sensitive member and donor information as a condition of operating in the State. *See* 594 U.S. at 618; 357 U.S. at 451-53. The Court recently observed that "banning [an] organization from the State" presents the First Amendment problem "in its starkest form." *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174, 185 (2026). Hawai'i employs the same unconstitutional device.

The consequences for corporations are substantial. The Chamber is currently engaged in a communications campaign concerning the battle between free enterprise and socialism. Imel Decl. ¶¶ 7-11. It plans to extend that campaign to Hawai'i through communications supporting or opposing candidates for Hawai'i state office by discussing their positions on various issues, including Act 11 and other measures affecting the business community, with approval or disapproval. Imel Decl. ¶¶ 12-16. Act 11 classifies such advocacy as prohibited "election activity," § 8 (§ 414D-14), subject to significant consequences, § 23 (§ A-1(5)); § 10

(§ 414D-52(f)). The Act therefore presents the Chamber with an immediate choice: refrain from protected political advocacy or risk the loss of valuable legal benefits, among other sanctions. The unconstitutional-conditions doctrine does not permit Hawaiʻi to impose that choice.

## III. The Chamber Is Likely To Succeed On Its Overbreadth Claim

Act 11 is unconstitutionally overbroad. In the First Amendment context, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Americans for Prosperity Found.*, 594 U.S. at 615.

The first step is to "determine what the law covers." *Moody v. NetChoice, LLC*, 603 U.S. 707, 725 (2024) (cleaned up). Here, that is straightforward. Act 11 categorically prohibits all "artificial persons" from making any "expenditures in connection with elections and ballot measures." §§ 1, 2.

The next step "is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Moody*, 603 U.S. at 725. That inquiry is unusually straightforward here because Act 11 does not regulate different covered speakers or activities differently. It imposes the same across-the-board prohibition on all political advocacy by every covered entity. The question is therefore not whether some applications raise constitutional concerns while others do not, but whether the categories of speech Act 11 prohibits are constitutionally

protected. Because Act 11 "raise[s] the same First Amendment issues in every application," the court "do[es] not need a dense factual record to know how these settings will play out in the real world." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1022 (9th Cir. 2025) (facially invalidating content-based speech restriction) (cleaned up). The violation is "categorical" and "present in every case." *Americans for Prosperity Found.*, 594 U.S. at 615 (facially invalidating donor-disclosure requirement); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116 (9th Cir. 2024) (facially invalidating compelled reporting requirement where all "covered businesses" were "under the same statutory obligation").

The prohibition on ballot-issue advocacy is unconstitutional in every application. In *Bellotti*, the Supreme Court facially invalidated a Massachusetts law prohibiting corporations from making expenditures to influence ballot questions unless the measure materially affected the corporation's property, business, or assets. 435 U.S. at 767-68. Act 11 goes further still, prohibiting all ballot-measure advocacy by artificial persons regardless of the subject matter. *Compare ibid. with* Act 11 § 8 (§ 414D-14). If the statute invalidated in *Bellotti* violated the First Amendment, then Act 11, which prohibits an even broader category of ballot-measure advocacy, necessarily does as well.

The prohibition on election-related advocacy is likewise unconstitutional in all or nearly all applications. After *Citizens United*, it is beyond dispute that

corporations have a First Amendment right to make independent expenditures supporting or opposing candidates. *See* 558 U.S. at 365 (finding "no basis for allowing the Government to limit corporate independent expenditures"). The statute the Court held unlawful prohibited independent expenditures in federal elections for communications that "expressly advocate the election or defeat of a candidate," as well as independent expenditures for so-called "electioneering communications," a statutory term defined as those that refer to "a clearly identified candidate" within a specified number of days before an election. *Id.* at 320-21. Act 11 prohibits *even more* speech. Its definition of "election activity" reaches all independent expenditures supporting or opposing candidates, political parties, and political committees, without regard to timing or whether they contain express advocacy. *See* § 8 (414D-14). Whereas the federal restrictions invalidated in *Citizens United* were limited to express advocacy and electioneering communications during defined pre-election periods, Act 11 reaches independent expenditures supporting or opposing candidates, parties, and political committees and without those limitations. Act 11 therefore reaches substantially more speech than the statute held unconstitutional in *Citizens United*.

At most, Act 11 may have a limited constitutional application with respect to direct candidate contributions potentially governed by *FEC v. Beaumont*, 539 U.S. 146 (2003). Courts have repeatedly recognized *Beaumont*'s tension with *Citizens*

*United*. *See, e.g.*, *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 879 n.12 (8th Cir. 2012) (en banc) ("*Citizens United* ... casts doubt on *Beaumont*, leaving its precedential value on shaky ground" (cleaned up)). But the Court need not resolve that tension. Even assuming *Beaumont* remains good law, Act 11 still prohibits a vast quantity of undeniably protected speech. The unconstitutional applications therefore do not merely exceed the statute's legitimate sweep. They overwhelmingly predominate. Act 11 is therefore substantially overbroad and facially unconstitutional.

## IV. THE REMAINING FACTORS FAVOR INJUNCTIVE RELIEF[5]

The remaining preliminary-injunction factors overwhelmingly favor relief. Absent an injunction blocking Act 11's enforcement, the Chamber must either forgo protected political advocacy in Hawai'i or risk the substantial penalties the statute imposes. Imel Decl. ¶¶ 17-18. The chilling effect is already occurring. The Chamber is planning its advocacy efforts for the next election cycle now and must make those decisions now under the shadow of Act 11. Imel Decl. ¶ 19.

That injury is irreparable. Indeed, "[t]he harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the

---

[5] Even if the Court concludes that further development of the equitable factors is necessary, it may convert the Plaintiff's motion to one for summary judgment and resolve the purely legal issues presented. *See, e.g.*, *King Cnty. v. Azar*, 320 F. Supp. 3d 1167, 1170 (W.D. Wash. 2018).

essence in politics and a delay of even a day or two may be intolerable." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (cleaned up). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (alterations rejected). Irreparable harm is readily established where a plaintiff demonstrates a likely First Amendment violation. *See Hubbard v. City of San Diego*, 139 F.4th 843, 853 (9th Cir. 2025); *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024).

The balance of equities and public interest point in the same direction. *See Nw. Ass'n Indep. Schs.*, 166 F.4th at 1156 (equitable factors "merge" when government is a party). Hawai'i has no legitimate interest in suppressing constitutionally protected political speech. *See Hubbard*, 139 F.4th at 853. By contrast, denying relief would prevent the Chamber from criticizing or praising candidates' positions on free-enterprise issues, including Act 11. Imel Decl. ¶¶ 16, 18. The public has a substantial interest in receiving competing views about candidates, elections, and matters of public policy. *See Bellotti*, 435 U.S. at 783-84; *Citizens United*, 558 U.S. at 349. Enjoining Act 11 will preserve, rather than disrupt, the free exchange of political ideas that the First Amendment exists to protect.

Because the Chamber is likely to succeed on the merits, faces irreparable injury absent relief, and has established that the balance of equities and public

interest favor an injunction, the Court should preliminarily enjoin enforcement of Act 11.

## CONCLUSION

The Court should grant the Motion.

DATED: Honolulu, Hawai‘i, September 24, 2026.

*/s/ Trever K. Asam*
TREVER K. ASAM
LINDSAY N. MCANEELEY
CALEB P. BURNS*
JEREMY J. BROGGI*
JONATHAN D. URICK*
KEVIN R. PALMER*

Attorneys for the
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
* *Pro Hac Vice* Motions Forthcoming